McKinney, J.,
delivered the opinion of the court.
This was a petition to the circuit court of Davidson, for the partition of real estate and the sale of certain slaves.
William Richardson died, perhaps in the year 1847. He left surviving him his widow, Cynthia Richardson, and the following named children, Elizabeth, (who intermarried with Isaac E. Morris,) Turner, James, Cynthia, Dudley and John. The widow and children, except Elizabeth, removed to Arkansas shortly after the death of William Richardson, where they remained till December, 1849, at which time they returned to Davidson county, their former place of residence.
On the 3d of December, 1849, Peter B. Morris procured himself to be appointed, by the county court of Davidson, guardian for the last named five children, all of whom were minors. This appointment was before the return of said minor children from Arkansas, and, as it appears, without their knowledge or consent; three of them, at that time, being over the age of fourteen years.
At the January term, 1850, this petition was presented by said guardian; in which said minors are joined as petitioners, with the widow and Isaac E. Morris and wife; the minors sueing by P. B. Morris as guardian and next friend.
From the petition and proof it appears, that William Richardson, previous to his death, was the owner of a tract of land in Davidson county, of upwards of six hundred acres, three slaves, named Jake, Wash and Dick, and other personal property; that he duly made and published his last will and testament, which was admitted to probate ; by which he, in substance, gave to his wife and children all his personal estate, to be equally divided between them; the wife’s share to be allotted to her at his death ; the executors to take charge of the children’s parts, and manage the same in such manner as *391 they might “think most prudent for their support, raising and education;” and when any child attained the age of twenty-one years, the executors to give such child its share of the estate. It further appears, that shortly before his death, to wit, on the 24th November, 1846, said William Richardson made a gift, by deed duly executed, of three female slaves, of which he was the owner, namely, Harriet, about 17 years of age, Maria, about 22 years of age, and her child, about 4 years, to his children above named ; reserving a life interest to himself. The executors named in the will declined to qualify, and administration with the will annexed was granted to George Gill, who, it is stated in the petition, has closed his administration, and delivered over said slaves.
The petition seeks to have the widow’s portion cf the real estate assigned to her, and partition of the remainder made among said children, to which there is no objection made ; and also to have said six slaves sold, on the ground that a division cannot otherwise be made of them. On the hearing, the circuit judge directed that the slaves should be sold, upon the assumption that they could not be divided, and that the proceeds should be distributed. The guardian, P. B. Morris, was appointed commissioner to make the sale, with authority to sell privately, but not under the prices fixed by the court, and stated in the decree, and he was required, to make report of sales to the next term.
The slaves were sold privately, except Maria and child, and brought $3340 00, being ten dollars less than the aggregate value estimated by the court. The sales were all to relations, or family connections, of the guardian.
The minors appeared, by their guardian ad litem, at the next term of the court, and opposed the confirmation of the sale of said slaves, and asked to have it set aside, as illegal and unauthorized. The court refused to confirm the sale, being of opinion, that it was illegal to sell the whole of the *392 slaves, in order to assign to the widow and married daughter their respective shares ; and, because, in the opinion of the court, it was not for the interests of the minors that their shares of said slaves should be sold. The sale was, therefore, ordered to be set aside; the purchasers to be discharged from their purchases, and their notes to be delivered up to be can-celled ; and that the purchasers should deliver the slaves by them respectively purchased, to the guardian ad litem of the minors, to be held by him subject to the further order of the court. From this order, the guardian, Morris, appealed to this court.
1st. This petition being regarded, by our law, as a proceeding in equity, the whole case is open before us for hearing, upon the pleadings and proof, just in the same manner as it was before the circuit judge. We hear the case on appeal, upon its merits, as if no decree had been pronounced in the court below, and make such decree as may be deemed proper, upon the whole case. The question, therefore, as to the power of the judge, at a subsequent term, to make a final decree annulling in effect the interlocutory decree made at a previous term, is one of no practical consequence, so far as the action of this court is concerned. If the power were even denied, the obstacle presented in the court below, by the previous decree, does not lie in our way.
2d. The counsel for the minor children has made the question, whether the circuit court has jurisdiction to order the sale of slaves, belonging to minors, for the purpose of division, at the instance of a guardian, or next friend.
This question depends entirely upon the several statutes relating to this subject.
The act of 1827, ch. 61, sec. 2, confers concurrent jurisdiction on the circuit and chancery courts, to order the sale of slaves, at the instance of any “executor or administrator,” in three specifid cases: First, where a sale may be necessary for *393 the payment of debts; second, where it is for the interest of the legatees, or those entitled to distribution, to make such sale; and, third, where a division cannot be made among the legatees or distributees of the estate, without such sale.
By the act of 1835, ch. 20, sec. 1, concurrent jurisdiction is given to the circuit and chancery courts, in all cases of “petitions or bills for the partition or sale of real estate, by administrators, executors, guardians, heirs, or tenants in common also, of “petitions for the sale of slaves by administrators, executors, or guardians ; and likewise of petitions for dower, and divorce.
And by act of 1838, ch. 156, sec. 1, the like concurrent jurisdiction is conferred “of all cases of petitions or bills, for the division of slaves, or other personal property.”
Construing these several enactments together, we think there can be no doubt of the power of the circuit or chancery court, upon a proper case being presented, distinctly falling within either of the three classes specified in the act of 1827, and established in the mode contemplated by that act, to direct the sale of slaves, on the application of a guardian, or next friend of infants, in the same manner as if the application were by an executor or administrator. The sale authorized to be directed by the circuit or chancery court, by the act of 1835, in express term embraces applications by guardians, as well as executors and administrators; and necessarily applies to a sale for the purpose of division, as much as to a sale for any other purpose sanctioned by the act of 1827. But, under the act of 1838, if there were no other provision on the subject, the power conferred to order a division of slaves, would necessarily imply and carry with it, the power to order a sale for the purpose of division, where such division could not otherwise be made. The right of a next friend to present such petition, is not in terms recognized by either of the foregoing statutes, nor was it necessarv. The an *394 cient and most approved practice in courts of equity is, that all bills or petitions on behalf of infants, shall be instituted by their next friend; though, according to some authorities, they may sue in equity, as well as at law, either by their guardian, or next friend, (Story’s Eq, PL s-c. 57-58, & notes,) and we are not to suppose that it was the intention of the Legislature to abrogate this practice.
3d. But, conceding the jurisdiction of the circuit court, the more important question remains, was the case presented in this record proper for its exercise, so far as the interests of the infants were concerned? Ordinarily, a guai’dian will not be permitted to change the property of an infant, whether real or personal, into a different kind of property, or into money. Such a change might not only operate prejudi-cially to the rights of the infant; but in some cases, even under our law, it might affect the rights of others materially. A court of equity will be cautious and vigilant in the exercise of this power. It will not sanction such change, unless where it is manifestly for the benefit of the infant to change the nature of the estate. It regards with jealousy such applications, and “is always inclined to keep a strong hand over guardians, in order to prevent partiality and misconduct.” 2. Story Eq., sec. 1357.
And most of all should a strong care be required, where the effect of such change will be, as in the present case, to violate and set at naught the apparently judicious and cherished purpose distinctly declared in the will of the deceased parent. The power conferred upon the circuit court, by the statute is limited; and, as we have had occasion before to state, is to be regarded as a special jurisdiction. The duty is enjoined upon the court to be satisfied of the truth of the alleged necessity for the sale or change of the property. And the court is not to be so satisfied from the mere loose, and, perhaps, unscrupulous statements of the petition ; nor from the some *395 times equally unsatisfactory statements of witnesses, brought perhaps on purpose, to sustain the application; nor from the often unmeaning report of the clerk to whom, as is the practice in some places, the matter is referred. The law contemplates that the judgment and conscience of the judge shall be satisfied, by evidence of a character to convince an intelligent mind. It is not enough that the petition states, and that witnesses assert, that a division of slaves cannot be made, or that it would be for the benefit of the parties to have them sold, when the facts of the case demonstrate exactly the contrary conclusion. Take the present case as an illustration: There are six persons surviving, equally entitled to share, perhaps, the same number of slaves. Two of the six thus entitled, are adults, and four minors. The sale of two of the slaves, (admitting that a division could otherwise not be made,) would be perhaps sufficient to satisfy the claims of the adults; where, then, was the necessity for selling all? And how could it be for the benefit of the minors) when it is manifest, from the description of the slaves, that the hire of the portion to which the minors were entitled would be reasonably worth double the interest of the money for which they would have sold? Upon these self-evident facts, without other evidence, or even against the mere opinions of witnesses, the judge might well have rested in refusing to order a sale of the interest of the infants in said slaves, and we think he clearly erred in not doing so. And the error is the more palpable, inasmuch as the sale seems to have been directed without any evidence whatever in support of the petition.
The policy of our law is opposed to the sale of slaves belonging to infants, unless in the specific cases enumerated in the statute; and it has been repeatedly held by this court, that to maintain such sale there must be a strict compliance with the requirements of the statute, not in form merely, but in substance and spirit; otherwise the sale will be utterly' *396 void as against such infants. No less stringent rule will suffice to guard the interests of minors against the abuses which have been, and may be, practiced under color of law.
In the final decree of the circuit court there is no error.